AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Blue Apple iPad<br>DEA SSEE S000119051<br>(Device 6 "D6") | ) ) ) ) ) ) Case No. 26mj1437 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-6

located in the __Southern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Possession with intent to distribute, and distribution of controlled substances and conspiracy to commit the same. |

The application is based on these facts:
See Affidavit of DEA Task Force Officer Dylan Boylan, incorporated by reference herein.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Dylan J. Boylan*
Applicant's signature

Dylan Boylan, Task Force Officer, DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__Telephone__ *(specify reliable electronic means)*.

Date: 03/12/2026

Judge's signature

City and state: San Diego, CA

Steve B. Chu
Printed name and title

# AFFIDAVIT

I, Dylan Boylan, having been duly sworn, declare and state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device:

> Device 1:
> Black Apple iPhone
> DEA SSEE S001129465
> (**Device 1 "D1"**)
>
> Device 2:
> Gray Apple iPhone
> DEA SSEE M000012411
> (**Device 2 "D2"**)
>
> Device 3:
> Black Apple iPhone
> DEA SSEE S001726194
> (**Device 3 "D3"**)
>
> Device 4:
> Purple Apple iPhone
> DEA SSEE S001726195
> (**Device 4 "D4"**)
>
> Device 5:
> Black Apple iPhone
> DEA SSEE S001726196
> (**Device 5 "D5"**)
>
> Device 6:
> Blue Apple iPad
> DEA SSEE S000119051
> (**Device 6 "D6"**)

(hereinafter collectively "**Target Devices**") as further described in Attachments A-1 through A-6, and to seize evidence of crimes, specifically violations of 21 U.S.C. §§ 841(a)(1) and 846, as further described in Attachment B. The requested warrant relates to

the investigation and prosecution of Gianna CARDONA ("CARDONA"), Yuriel CEPEDA ("Y. CEPEDA"), Dariel CEPEDA ("D. CEPEDA"), Grening PEGUERO ("PEGUERO"), and Christopher SOLER ("SOLER"), for possessing a mixture and substance containing a detectable amount of cocaine with the intent to distribute said mixture and substance. The **Target Devices** are currently in the custody of the Drug Enforcement Administration, and located at 5810 Newton Drive, Carlsbad, California, 92008.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## TRAINING AND EXPERIENCE

3. I am a detective with the Escondido Police Department and have been so employed since February 2014. I am currently assigned as a Task Force Officer with the Integrated Narcotics Task Force (NTF) San Diego and have been so assigned since November 2020. I have been deputized by the Drug Enforcement Administration (DEA). As such, I am an "Investigative or Law Enforcement Officer" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4. Upon my assignment to NTF, I received training in all aspects of controlled substance investigations, including but not limited to the enforcement of drug laws, investigation of drug trafficking, drug recognition and terminology, case management, undercover operations, interviewing techniques, the gathering of evidence, the use of electronic surveillance, the movement of money representing the proceeds of drug trafficking and other criminal activity, and money laundering. In connection with my official NTF duties, I investigate criminal violations of federal drug laws and related

offenses, including violations of Title 21, United States Code, Section 801 et seq. of the Federal Controlled Substances Act, and violations of Title 18, United States Code, Sections 1956 and 1957. I have received training, both formal and informal, relating to the above investigations, and I have attended the DEA's Task Force Officer School.

5. By virtue of my employment as a Task Force Officer with NTF, I have performed various tasks, which include but are not limited to: functioning as a surveillance agent and thereby observing and recording the movements of persons trafficking in controlled substances and those suspected of trafficking in controlled substances, as well as those engaging in the distribution of monies and assets derived from the illegal trafficking of controlled substances (laundering of monetary instruments); interviewing witnesses, cooperating individuals, and informants relating to the illegal trafficking of controlled substances and the laundering of monetary instruments; obtaining court authorized interceptions, pen register/trap and trace devices, and search warrants; monitoring and reviewing recorded telephone calls and text messages pursuant to Title III court orders; handling confidential sources with access to drug dealers; participating in telephone toll analysis, undercover operations, mail covers, and electronic examinations of evidence; and functioning as a case agent, which entails the supervision of specific investigations involving the trafficking of drugs and the laundering of monetary instruments.

6. My ongoing work with NTF requires that I keep apprised of recent trends and developments involved in the investigation of drug traffickers, and I regularly communicate with agents from the United States Border Patrol, Customs and Border Protection, Homeland Security Investigations, Federal Bureau of Investigations, Bureau of Alcohol Tobacco and Firearms, and various other state and local law enforcement officers. Furthermore, I have had discussions with them about their investigative techniques and their experiences operating within the Southern District of California.

7. Based on my training, experience and conversations with other law enforcement officers, I have gained a working knowledge of the operational habits of

narcotics traffickers and the unique trafficking patterns employed by narcotics organizations. I am aware that it is common practice for drug traffickers to work in concert utilizing cellular telephones to maintain and store communications and related items with co-conspirators in order to further their criminal activities. I know that drug traffickers often require the use of a telephone to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and arranging the disposition of the proceeds from the sales of controlled substances. I know that professional drug operations depend on maintaining their extensive contacts. The telephone enables drug dealers to maintain contact with drug associates, drug suppliers and drug customers. I also know that drug traffickers sometimes use fraudulent information, such as false names and addresses, to subscribe to communication facilities, especially cellular phones, and frequently use communication facilities to thwart enforcement efforts to intercept.

8. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that conspiracies involving distribution of controlled substances generate many types of evidence including, but not limited to, cellular phone evidence such as voicemail messages referring to the arrangements of payment, names and contact information for co-conspirators, photographs, text messages, emails, messages from text messaging applications such as WhatsApp, social networking messages, and videos reflecting co-conspirators or illegal activity. I am also aware that cellular telephones (including their SIM card(s)) and other portable electronic devices (such as Laptops, iPads, Tablets, etc.) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular

telephone. Specifically, searches of cellular telephones of individuals involved in the importation, transportation, and distribution of narcotics may yield evidence:

a. tending to indicate efforts to possess with intent to distribute methamphetamine or other federally controlled substances;

b. tending to identify accounts, facilities, storage Device, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of or possession with the intent to distribute methamphetamine, or some other federally controlled substance, within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of or the possession with the intent to distribute methamphetamine, or some other federally controlled substance, within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of or possession with the intent to distribute methamphetamine, or some other federally controlled substance, within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the users of, or persons with control over or access to, **Devices 1-6**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

9. Beginning in March 2023, the Drug Enforcement Administration (DEA) initiated OCDETF Operation Snort and Sort, an investigation into a drug trafficking organization led by Luis GUZMAN and Eric IRWIN. Through the investigation, IRWIN was identified as a multi-pound methamphetamine, cocaine, and fentanyl trafficker operating in the Southern District of California. IRWIN manages a United States Service (UPS) store which he uses to facilitate his distribution of drugs to other source cities.

10. On November 18, 2025, the Honorable Robert S. Huie, U.S. District Court Judge, Southern District of California, authorized a ninth round of Federal Title III wire and electronic intercepts and cellular device geolocation under court order 23-MC-1730-JLS. The phones included (602) 648-1068 ("TT-14"), used by CARDONA.

11. While intercepting communications made to and from TT-14, I identified a pending purchase of five kilograms of cocaine, to be made on December 09, 2025, by CARDONA. Members of my team and I initiated surveillance of CARDONA in the early morning hours of December 09, 2025, while utilizing GPS "ping" data for TT-14. Through law enforcement databases, I was also aware that CARDONA rented a gray BMW SUV bearing California license plate 9VAX764 ("Target Vehicle 1") in Los Angeles, California.

12. Ultimately, we were unable to locate CARDONA prior to the scheduled transaction. I followed the ping location provided for TT-14 to the area of the 800 block of Arcadia Avenue in Arcadia, California. Based on wire intercepts, I knew that CARDONA was likely residing at 827 Arcadia Avenue, Apartment A. CARDONA received a multimedia image on December 02, 2025, that contained an image of the exterior of an apartment with "827 A" depicted on the outside of a dwelling. I exited my vehicle and walked the complex in the vicinity of the ping data for TT-14. I observed that the exterior of 827 Arcadia Avenue, Apartment A ("Target Location") and the multimedia message sent to TT-14 were an exact match, other than the placement of patio chairs and some other minor details.

13. I also knew that CARDONA was due to return Target Vehicle 1 by 12:00 p.m. on December 09, 2025. Believing that CARDONA purchased five kilograms of cocaine earlier in the day and believing that CARDONA was likely to return to his home in New York on the same day, I directed Arcadia Police to conduct a traffic stop on Target Vehicl 1 if it left the Target Location. As I began preparing an application for a search warrant to search the Target Location, investigators observed Target Vehicle 1 depart the Target Location.

14. Moments later, Arcadia Police conducted a traffic stop on Target Vehicle 1 for an observed violation of California Vehicle Code 22450 - Failing to Stop for a Stop Sign. Officers then contacted the three occupants of the Target Vehicle, CARDONA, Y. CEPEDA, and PEGUERO.

15. A short time later, investigators observed a male, who was later determined to be D. CEPEDA, the brother of Y. CEPEDA. Investigators observed D. CEPEDA on foot in the area of the Target Vehicle 1 traffic stop. Investigators observed D. CEPEDA walk to the gas station directly across from the traffic stop. After approximately 2-3 minutes, investigators observed D. CEPEDA exit the gas station without any obvious purchases. Investigators then observed D. CEPEDA enter a GMC SUV ("Target Vehicle 2") bearing California license plate 9NFW511 and remain at the location. Investigators then observed D. CEPEDA exit Target Vehicle 2, walk back toward the parking lot adjacent to the traffic stop and continue watching the traffic stop of Target Vehicle 1 while making apparent wire communications on his cellular phone. Investigators further observed D. CEPEDA walk to a nearby pharmacy and continue to observe the traffic stop.

16. A subsequent records check on Target Vehicle 2 revealed it was also a rental vehicle owned by Sixt Rental Cars. A check of law enforcement databases revealed that Target Vehicle 2 and Target Vehicle 1 likely travelled in tandem with one another for a portion of the trip to and from the cocaine transaction. Target Vehicle 1 was determined to be in the area of Northbound Mckinley Street north of Promenade Avenue at 6:29 (and 56 seconds) a.m. Target Vehicle 2 was determined to be in the same location, in the same lane, just one second behind Target Vehicle 1. Law enforcement databases also indicated that Target Vehicle 1 was in the area of Interstate 15 and Hidden Valley Boulevard at approximately 6:33 (0 seconds) a.m. Target Vehicle 2 was determined to be just three seconds behind Target Vehicle 1. The records reflected the Target Vehicle 2 and the Target Vehicle 1 to have been on both surface streets in Corona California together and on Interstate 15 with one another.

17. I then directed Arcadia Police officers to conduct a consensual contact with the driver of Target Vehicle 2 and enlist the assistance of a Police Service Dog (PSD). Arcadia Police drove a marked unit into the area of Target Vehicle 2, which resulted in Target Vehicle 2 driving away from the area moments later. Ultimately, Arcadia Police observed the driver of Target Vehicle 2 using a cellular phone while driving, in violation of California Vehicle Code 23123.5 - Distracted Driving. Officers then conducted a traffic stop on Target Vehicle 2 and detained the driver. Upon contact, Arcadia Police officers identified the driver of Target Vehicle 2 as D. CEPEDA, the brother of Y. CEPEDA, who was an occupant of Target Vehicle 1.

18. At approximately 4:28 p.m., The Honorable Judge Charles Chung of Los Angeles County Superior Court authorized TFO Boylan's request for a search warrant to search 827 Arcadia Avenue Apartment A in Arcadia, California.

19. At approximately 5:30 p.m., Arcadia Police officers and detectives knocked and announced their presence at the Target Location. During the service of the search warrant, Arcadia Police located Christopher SOLER inside of the Target Location, hiding behind a large mirror in an upstairs bedroom. SOLER was placed under arrest and transported to Arcadia Police Department Headquarters (APDHQ), where CARDONA, Y and D CEPEDA and PEGUERO were also detained.

20. During the service of the search warrant, I identified numerous quantities of different controlled substances in bulk quantities, paraphernalia, packaging materials and bulk United States currency, most of which were in plain view. Additionally, a total of six large suitcases were located within the residence, indicating multiple individuals were residing within the residence. Identifying documents were found for all arrestees other than Y. CEPEDA. I believe it is inherently likely that the individuals were involved in a broad conspiracy to collect and distribute controlled substances together. Of note, the only individual who did not have identifying documents within the home was Y. CEPEDA. However, Yuriel and Dariel CEPEDA confirmed their relationship as brothers and Yuriel was detained in a vehicle seen leaving the residence with three other occupants of the home.

21. In total, I located approximately 6 kilograms of cocaine, approximately 150 pounds of marijuana, $176,114.00 in United States currency, and the **Target Devices**. **Device 1** was seized from a bedroom believed to be utilized by G. PEGUERO. **Device 2** was seized from an upstairs bedroom, in a pair of pants with Christopher SOLER's driver's license. **Device 3** was also seized from an upstairs bedroom, in a pair of pants with Christopher SOLER's driver's license. **Device 4** was seized from the kitchen counter with an apparent counterfeit identification card, believed to belong to Christopher SOLER. **Device 5** was seized from an upstairs bedroom believed to be utilized by Dariel CEPEDA. **Device 6** was from an upstairs bedroom believed to be used by Dariel CEPEDA.

22. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that SOLER, D. CEPEDA and PEGUERO were using the **Target Devices** to communicate with others to further the distribution of illicit narcotics within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug trafficking event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as a defendant, to attempt to minimize the amount of time they were involved in their trafficking activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Telephone for data beginning on November 25, 2025, up to and including December 09, 2025.

## METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I will collect the **Target Devices** and subject the **Target Devices** to analysis. All forensic analysis of the data contained within the **Target Devices** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the

identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

26. Law enforcement has not downloaded the **Target Devices** to date. Law enforcement is seeking the instant warrant to obtain a full and comprehensive forensic download of the **Target Devices**.

### CONCLUSION

27. Based on all of the facts and information described above, my training and experience, and consultations with other law enforcement officers, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 by SOLER, D. CEPEDA, PEGUERO, and other members of the conspiracy. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachments A-1 through A-6, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Dylan J. Boylan*
_____
Task Force Officer Dylan Boylan
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 12th day of March, 2026.

_____
HON. STEVE B. CHU
UNITED STATES MAGISTRATE JUDGE

11

## **ATTACHMENT A-6**

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Device 6:
>Blue Apple iPad
>DEA SSEE S000119051
>(Device 6 "D6")

Device 6 is currently in the custody of the Drug Enforcement Administration and located at 5810 Newton Drive, Carlsbad, California, 92008.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachments A-1-A-6 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Devices will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, web history, files, metadata, photographs, audio files, videos, and location data, for the period of November 25, 2025, up to and including December 9, 2025:

a. tending to indicate efforts to possess with the intent to distribute controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of or possession with the intent to distribute controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of or possession with intent to distribute of controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of or possession with the intent to distribute controlled substances within the United States, such as stash houses, load houses, or delivery points;

d. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846.